UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
MICHAEL CRENSHAW,                )
         Plaintiff,           )     CIVIL ACTION
                                 )
V.                               )     NO. 15-cv-40086-TSH
                                 )
TOWN OF SOUTHBOROUGH,            )
JEAN KITCHEN, in her individual and )
official capacity, and JANE MORAN, in )
her individual and official capacity, )
         Defendants.          )
_____)

## ORDER AND MEMORANDUM ON DEFENDANTS MOTION FOR SUMMARY JUDGMENT
(Docket No. 51)

**March 29, 2018**

**HILLMAN, D.J.**

### Background

This action stems from the termination of a Southborough police officer after he requested injured-on-duty ("IOD") leave. The plaintiff, Michael Crenshaw alleges that he was entitled to IOD leave because of the stress and anxiety he suffered as a result of his activity as a police officer and on behalf of the Southborough Police Department Union, Local 167 (the "Union"). He brings the instant action against the town of Southborough (the "Town"), former Southborough police chief, Chief Jane Moran ("Moran"), and former town administrator, Jean Kitchen ("Kitchen") alleging: (I) violation of his procedural due process rights; (II) violation of his substantive due process rights; (III) intentional interference with advantageous relations; (IV) violation of implied covenant of good faith and fair dealing; (V) intentional interference with prospective advantageous relations; (VI) abuse of process; (VII) defamation and; (VIII) intentional infliction of emotional distress. This memorandum discusses whether the Defendants are entitled to summary judgment

with regards to the claims of substantive due process, intentional interference with advantageous and/or prospective advantageous relations, and intentional infliction of emotional distress.[1]

## Facts

Michael Crenshaw was hired by the Southborough Police Department (the "Department") as a civilian dispatcher in 2002, as a full-time police officer in 2006, and completed the police academy in 2007. In December 2007, Crenshaw became the president of the Union. During his time as president he filed a number of complaints, many of which alleged misconduct of fellow police officer Sgt. Slatkovitz. In May 2008, police chief Webber and Kitchen ordered Crenshaw, to file a written report detailing his complaints of employee violations of Department rules and Massachusetts law. Crenshaw wrote a detailed report which included allegations that Sgt. Slatkovitz improperly released suspects, and other conduct which resulted in unsafe working conditions. After an investigation, Chief Webber found Sgt. Slatkovitz in violation of Police Department Rules and Regulations for one incident but otherwise found no other inappropriate conduct by Sgt. Slatkovitz or any other Department employee.

Chief Moran was appointed chief of the Department after Chief Webber passed away in 2009. In 2010, Crenshaw again became the Union president.[2] In July 2010, Crenshaw and a fellow police officer met with Chief Moran regarding their concerns about Sgt. Slatkovitz. Chief Moran followed up with an email to Crenshaw, recommending that he seek counseling for his personal grudge against Sgt. Slatkovitz. In August, acting as Union president, Crenshaw asked for clarification on a driving restriction placed on a fellow officer. Chief Moran forwarded his request

---

[1] Summary judgment is granted as to counts I, IV, VI, and VII because Crenshaw concedes that he cannot legally maintain them.
[2] Crenshaw was president of the Union from December 2007 until August or September of 2008. He then became president again in 2010.

to a Union attorney stating that "one of these days he will go [too] far and get written up." (Doc. No. 72 at ¶114). The Union filed a charge of prohibited practice against Chief Moran alleging that this response constituted a threat intended to discourage Crenshaw's Union activity.

On December 25, 2010, a fellow patrolman was ordered to remain on patrol by Sgt. Slatkovitz instead of escorting an arrestee to the hospital; the suspect fled. Crenshaw contacted Chief Moran to discuss this incident and made plans to meet the following morning. Chief Moran refused to discuss the issue without Crenshaw's permission to record their conversation which Crenshaw declined, absent representation. Prior to leaving Chief Moran's office, Crenshaw requested clarification on the arrest policy. Chief Moran asked if he was able to implement and enforce her directives as police chief. Crenshaw replied, "yes, if we are all on the same page." (Doc. No. 65 at ¶ 18). Chief Moran told Crenshaw that he had not answered her question because she was requesting a yes or no response. Crenshaw again replied, "yes if we are all on the same page." *Id*. Chief Moran then placed Crenshaw on a two-day suspension and issued a written reprimand.[3] An unfair labor practice charge was filed against her on behalf of Crenshaw. As a result, the Town agreed to rescind and expunge the written reprimand from Crenshaw's personnel file provided he not disciplined for insubordination for two years.

After returning to work, Chief Moran reassigned Crenshaw to the 8:00 am to 4:00 pm shift in an effort to "keep an eye on him." (Doc. No. 65 at ¶ 21.) Sgt. Slatkovitz became Crenshaw's supervisor July 2011. On July 2nd, Crenshaw left work due to physical discomfort and was diagnosed with shingles. He returned to work on July 15, 2011. Three days later, Crenshaw felt

---

[3] On January 7, 2011, Chief Moran informed Crenshaw that he had not been suspended but was on administrative leave until an investigation involving his conduct could be conducted.

pain where he had shingles and was permitted to leave. He never returned to work for the Department.[4]

On July 23, 2011, Crenshaw sent Chief Moran a letter referencing IOD leave, pursuant to Mass. Gen. Laws ch. 41 §111F. The letter informed her that his medical leave was a result of the stress and anxiety experienced on the job. Chief Moran sent Crenshaw paperwork under the Family Medical Leave Act ("FMLA"), informed him that the Town was tentatively designating his absence as FMLA, and reserved the Town's right to have an independent physician evaluate him.

On October 3, 2011, Crenshaw was ordered to meet with Dr. Reade for an "Independent Medical Exam in regards to [Crenshaw] filing an injured on duty claim." (Doc. No. 53-18 p.1). Prior to meeting with Crenshaw, Dr. Reade requested all information in Crenshaw's employment file. Instead of providing everything as requested, Chief Moran provided an opinion-based summary of his employment history. She included her belief that Crenshaw was "fixated" on Sgt. Slatkovitz's job performance, had become "enraged" when his complaints against Sgt. Slatkovitz were unfounded and that his attitude was "spiraling downward," and he was "out of control." (Doc. No 65 at ¶ 148-50). She also failed to inform Dr. Reade that Crenshaw had filed most, if not all, of his grievances as a representative of the Union.

Before beginning the evaluation, Dr. Reade informed Crenshaw that she was not treating him, that the information discussed was not confidential, and *that it would be shared with his employer*. During the evaluation, Crenshaw disclosed a history of illegal drug use in 2004-2005. He stated that he had attended an outpatient detoxification program in Walpole to deal with that drug use, and that he had been taking Suboxone to manage his opioid dependency since 2007.

---

[4] Crenshaw does not remember whether or not he worked any shift with Sgt. Slatkovitz prior to July 2nd but believes that Sgt. Slatkovitz was working with him on July 15th and 18th.

4

Crenshaw states that he informed Chief Webber about his substance abuse when he first sought treatment in 2005.[5]

Immediately upon learning of this information, Chief Moran looked into Crenshaw's application for a license to carry a firearm. Crenshaw had applied for and was granted a license in July 2008 from the Millville Police Department.[6] Question nine of the application asks, "[a]re you or have you ever been under treatment or confinement for drug addiction or habitual drunkenness?" (Doc. No. 65 at ¶ 8). "Crenshaw answered, 'No' in writing and signed the applications under the pains and penalties of perjury." *Id*. Crenshaw states that he believed the question was only asking if he had ever been confined for drug addiction and because he had not, he answered in the negative. Chief Moran sent a letter notifying the Millville Police Department of Crenshaw's disclosure of substance abuse and stated that he was "unsafe." Millville subsequently revoked his license to carry.

Dr. Reade completed her report, titled, "Fitness For Duty Evaluation," after meeting with Crenshaw and discussing some of his medical history with his providers.[7] Chief Moran requested that Crenshaw follow up with Dr. Reade because the report was inconclusive as to the extent of his history of substance abuse and the success of his treatment. She sent two letters in December ordering him to contact Dr. Reade. Crenshaw claims that he did not receive the letters therefore, he did not contact Dr. Reade.

---

[5] The Department's Rule 14.9 states that "Officers shall not possess and/or use on or off-duty any controlled substances, except with the approval and guidance of a licensed physician and with the knowledge of the Chief of Police. At no time may an officer use, abuse or be under the influence of a controlled substance where such use or influence impairs or compromises the efficiency and integrity of the officer, the department or the municipality." (Doc. No. 53-13 at p. 8-9).

[6] Crenshaw is a resident of Millville, Massachusetts.

[7] Crenshaw's motion to strike Dr. Reade's evaluation is denied.

In January 2012, Chief Moran sent a third letter ordering Crenshaw to appear for an investigatory interview. Crenshaw attended, represented by counsel. As advised by counsel, Crenshaw refused to answer questions about his substance abuse or sign medical releases. At the end of the interview, Crenshaw acknowledged that his failure to participate could result in further discipline, including termination.

A termination hearing was scheduled for February 28, 2012 in front of the Board of Selectmen (the "Board").[8] Crenshaw was notified about three weeks prior to the hearing. Four days before the hearing, Crenshaw requested a postponement in order to secure counsel but Kitchen declined this request. Both Chief Moran and Kitchen were present at the hearing; Chief Moran testified while Kitchen took notes.

After the hearing, the Board unanimously voted to terminate Crenshaw. The following reasons were listed for his termination: (1) Crenshaw's untruthful statement in his written application for firearm license, signed under the pains and penalties of perjury, in violation of Department Rules and Regulations 7.7; (2) his disqualification from carrying a firearm under Massachusetts and Federal law;[9] (3) failure to report substance dependency or use of controlled substance, in violation of Department Rules and Regulations 14.9; (4) Dr. Reade's opinion that Crenshaw's ongoing substance dependency made him unfit for duty, and Plaintiff's failure to produce evidence to the contrary; (5) insubordination in refusing to adhere to Chief Moran's written orders to contact Dr. Reade and failure to comply with her request to sign medical releases, in violation of Department Rules and Regulations 8.02; (6) The Board's finding that he testified

---

[8] The hearing was conducted in front of a three-person board.
[9] See 18 U.S.C. § 922; see M.G.L. c. 141, § 131.

untruthfully at the hearing when he stated that he never received Chief Moran's written orders mentioned above, in violation of Department Rules and Regulations 7.7.

Crenshaw received a letter notifying him of his termination on March 7, 2012. He filed this action on March 5, 2015, against the Town, Chief Moran, and Kitchen, in both their individual and official capacities.

## **Standard**

Summary judgment is appropriate when the evidence before the court provides, "no genuine issue as to any material fact and…the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine" issue is one that is supported by facts permitting a reasonable fact finder to resolve that issue in favor of the non-moving party. *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994). A "material" fact is one that may affect the outcome of the suit, under the applicable law. *Id.* It is the burden of the moving party to establish "an absence of evidence to support the non-moving party's position." *Mitchell v. City of Boston*, 130 F. Supp. 2d 201, 208 (D. Mass. 2001). The court shall make this determination while viewing "the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in [that] party's favor." *Id.* (quoting *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36 (1st Cir. 1995)).

### *The Town*

There are no allegation in the Complaint or in the pleadings of any custom, practice or policy of the Town that would subject the Town to liability. *See Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658 (1978). Accordingly, summary judgment is granted.[10]

---

[10] A claim against a municipal official in her official capacity is treated as claim against the entity itself. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991). Therefore, to the extent that Crenshaw sued Chief Moran and Kitchen in their official capacity, summary judgment is granted.

### Town Administrator Jean Kitchen

Crenshaw has sued Kitchen in her individual capacity. The record is completely devoid of facts subjecting Kitchen to liability. The only facts involving Kitchen suggest that she was aware that Crenshaw had filed complaints against the Department and its members, that he had been placed on administrative leave, that she was present at the termination hearing to take notes, and she declined to allow Crenshaw to postpone the termination hearing. None of these facts are sufficient to support a valid claim against Kitchen. Therefore, summary judgment is granted as to all claims asserted against her.

### Statute of Limitations

For claims arising under §1983, the Supreme Court instructs federal courts to borrow the applicable statute of limitations for general personal torts in the state in which the action arose. *Bartlett v. Massachusetts Parole Bd.*, 2013 WL 3766737, *3 (D. Mass. 2013) (citing *Wilson v. Garcia*, 471 U.S 261, 266-67 (1985) (federal courts should look to state law for relevant statute of limitations for §1983 claims)). For actions seeking relief under § 1983, the determination of "when a cause of action accrued is a matter of federal law." *Street v. Vose*, 936 F.2d, 40, 41 (1st Cir. 1991) (citing *Rodriguez Narvaez v. Nazario,* 895 F.2d 38, 41 n. 5 (1st Cir.1990)). The accrual period begins "when the plaintiff knows or has reason to know of the injury which is the basis of the action." *Id*. (quoting *Torres v. Superintendent of Police,* 893 F.2d 404, 407 (1st Cir.1990)).

It is undisputed that the applicable statutory period in this case is three years. See Mass. Gen. Laws ch. 260 § 2A. Crenshaw filed his complaint on March 5, 2015 therefore, to be actionable the alleged misconduct must have occurred on or after March 5, 2012. Defendants acknowledge that Crenshaw received his termination letter on March 7, 2012, but argue that because it was the Board and not Chief Moran or Kitchen's decision to terminate, the claims against them are time

barred.[11] I disagree. Crenshaw did not become aware the actual harm as a result of the alleged unlawful conduct by the Defendants until notification of his termination on March 7, 2012. Thus, the claims are not time barred.

*Substantive Due Process Claim*

In order to seek relief under 42 U.S.C. § 1983, Crenshaw must show that he "suffered the deprivation of an established property interest," through "governmental action that shocks the conscience." *Pagan v. Calderon*, 448 F.3d 16, 32 (1st Cir. 2006). Conscience shocking behavior is "at the very least 'extreme and egregious,'…'truly outrageous, uncivilized, and intolerable.'" *Id*. (internal citations omitted). "The burden to show state action that 'shocks the conscience' is extremely high, requiring 'stunning' evidence of 'arbitrariness and caprice' that extends beyond '[m]ere violations of state law, even violations resulting from bad faith' to 'something more egregious and more extreme." *Melendez-Garcia v. Sanchez*, 629 F.3d 25, 36 (1st Cir. 2010) (internal citations omitted). Courts should look to the particular facts of the case to make such a determination. *Pagan*, 448 F.3d at 32.

A. *Qualified Immunity*

Qualified immunity protects all officers but the "plainly incompetent or those who knowingly violate the law," from civil liability *Malley v. Briggs,* 475 U.S. 335, 341 (1986). The First Circuit applies the following two-part test to determine if qualified immunity applies: (1) whether the plaintiff has made out a violation of a constitutional right; and (2) whether that right was "clearly established" at the time of the violation. *See Maldonado v. Fontanes*, 568 F.3d 263, 269-70 (1st Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). To determine whether or not a right was clearly established, the court must determine whether the right, in

---

[11] It is undisputed that neither Chief Moran nor Kitchen have the authority to terminate.

9

general, was "sufficiently clear that a reasonable official would understand that what he [was] doing violate[d] that right," and whether or not, under the specific facts of the case, a reasonable official would have understood that he was violating that right. *Maldonado*, 568 F.3d at 269 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). A "reasonable, although mistaken, conclusion about the lawfulness of one's conduct does not subject a government official to personal liability." *Lowinger v. Broderick*, 50 F.3d 61, 65 (1st Cir. 1995) (quoting *Cookish v. Powell*, 945 F.2d 441, 443 (1st Cir. 1991)). The "salient question is whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional." *Maldonado*, 568 F.3d at 269; *see Mullinex v. Luna*, 136 S. Ct. 305, 308 (2015) (a right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates the right") (quoting *Reichle v. Howards*, 132 S. Ct. 2088 (2012)).

To the extent that Crenshaw asserts a claim for relief under § 1983 against Chief Moran, she is entitled to qualified immunity. Crenshaw fails to show that Chief Moran's conduct violated a clearly established right or that a reasonable officer would have understood that her conduct was clearly unconstitutional. Therefore, even assuming that Chief Moran's conduct was a violation of Crenshaw's rights, absent a showing that such a violation was clearly established at the time that Chief Moran acted, she is entitled to qualified immunity.

*Intentional Tort Claims*[12]

---

[12] Under the Massachusetts Torts Claims Act, a public entity may be held liable for tortious actions of a public employee with the exception of "any claim arising out of an intentional tort, including assault, battery, false imprisonment,...misrepresentation, deceit,...interference with advantageous relations or interference with contractual relations." *Kelley v. LaForce*, 288 F.3d 1, 12–13 (1st Cir. 2002); Mass. Gen. Laws ch. 258, § 10(c)). Therefore, to the extent Crenshaw seeks relief from the Town for counts III, V, and VIII, summary judgment is granted.

### A. Intentional Interference with Advantageous Relations

To state a claim for intentional interference with advantageous relations, Crenshaw must show that he had an advantageous relationship with a third party, that Chief Moran knowingly, intentionally, and with improper motive or means caused the breaking of that relationship, and that the breaking of that relationship caused him harm. *See Blackstone v. Cashman*, 448 Mass. 255, 260 (2007) (a plaintiff must establish "(1) he had an advantageous relationship with a third party…; (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions."). Chief Moran argues that Crenshaw cannot establish causation because the decision to terminate was made by the Board, not her, and none of the numerous reasons for his termination were a result of her alleged misconduct. Crenshaw focuses his argument on the evidence of malicious intent arguing that Chief Moran's acts were intentional, motivated by her desire to get him fired, and as a result, he was terminated.

While it is clear that Chief Moran did not make the final determination regarding Crenshaw's employment with the Department, the record suggests that she misled him to believe that Dr. Reade was conducting an independent evaluation, not a fitness for duty evaluation, and that she provided Dr. Reade with biased opinions while withholding other pertinent information, tainting his evaluation.[13] Additionally, because Chief Moran provided information to Millville police, his license to carry a firearm was revoked, setting in motion the other violations stated for

---

[13] The Defendant argues that she is entitled to common law qualified immunity for the intentional tort claims. However, because I find that she is entitled to summary judgment on the merits of the claims, I do not discuss this issue. *See Gildea v. Ellershaw*, 363 Mass. 800, 820 (1973) (officials acting in discretionary functions who do not act with malice, bad faith or corruption, may be entitled to common law immunity).

11

his termination. However, even assuming that Chief Moran acted with actual malice, Crenshaw cannot establish that her actions resulted in his termination.[14]

After Crenshaw requested IOD leave, Chief Moran preserved the Town's right to request that he submit to an evaluation by a Town designated physician.[15] He was subsequently ordered to participate in an "Independent Medical Exam in regards to [his] filing an injured on duty claim." (Doc. No. 53-18 p. 1). Assuming that Chief Moran acted with malice in ordering Crenshaw to meet with Dr. Reade, and assuming that she tainted the evaluation with her biases, it cannot be reasonably inferred that Chief Moran's tainting or mischaracterization of the evaluation influenced Crenshaw to disclose the information he provided, which gave rise to his termination. Prior to Crenshaw's disclosure about his history of substance abuse, he had received treatment in a facility and was currently being treated with Suboxone. He was informed by Dr. Reade that she was not his treating physician and would be reporting the substance of their conversation to his employer. Crenshaw emphasizes the fact that Chief Moran informed him that the evaluation was an "independent evaluation" but later referred to it as a "fitness for duty evaluation". I find that regardless of the characterization of the evaluation, it was Crenshaw's own statements, made

---

[14] It should be noted that Crenshaw likely cannot show actual malice. As discussed in greater detail below, the record shows that Chief Moran contacted Millville police after becoming aware of his potential unlawful license to carry a firearm, in compliance with the law and her role as the chief of police. *See Wright v. Shriners Hosp. for Crippled Children*, 412 Mass. 469, 476, (1992) (to show actual malice the plaintiff must show that the defendant acted "for a spiteful, malignant purpose, unrelated to the legitimate corporate interest." (citations omitted)).
[15] Mass. Gen. Laws ch. 41 § 111F provides that "[w]henever a police officer… is incapacitated for duty because of injury sustained in the performance of his duty without fault of his own,… is so incapacitated because of injuries so sustained, he shall be granted leave without loss of pay for the period of such incapacity; provided, that no such leave shall be granted … for any period after a physician designated by the board or officer authorized to appoint police officers…in such city, town or district determines that such incapacity no longer exists." Additionally, the Department's Rules and Regulations Rule 14.10 states that "Final disposition as to line-of-duty injuries, illness, or disabilities shall be made by the Chief of Police who may consult a physician." (Doc. No. 53-13 p. 9).

independent of any attempts by Chief Moran to have him terminated, and his subsequent refusal to participate in follow up, that gave rise to all of the Board's articulated reasons for his termination.[16] Therefore, even assuming that Chief Moran had acted in bad faith (and there is some evidence that she did), Crenshaw's termination was not a direct result of her conduct and she is entitled to summary judgment.[17]

## B. Intentional Infliction of Emotional Distress

To establish a claim for intentional infliction of emotional distress, Crenshaw must demonstrate that Chief Moran's conduct was "extreme and outrageous," that she intended to cause, or reasonably should have known that such conduct would cause, Crenshaw to suffer severe emotional distress, and that her conduct did in fact, cause severe emotional distress. *Agis v. Howard Johnson Co.*, 371 Mass. 140, 144-45 (1976). Emotional distress is severe if "no reasonable [person] could be expected to endure it." *Id*. "[C]onduct…beyond all bounds of decency and…utterly intolerable in a civilized community" constitutes "extreme and outrageous" behavior. *Foley v. Polaroid Corp.*, 400 Mass. 82, 99 (1987). "Liability cannot be founded upon mere insults, threats, or annoyances." *Id*. The determination of whether a defendant's conduct rises to this level is fact specific and therefore, it is no surprise that the parties in the present case dispute whether Chief Moran's conduct was extreme and outrageous.

---

[16] "An employer may seek a fitness-for-duty certification only with regard to the particular health condition that caused the employee's need for FMLA leave." 29 CFR § 825.312 (b). To the extent that Crenshaw argues that the mischaracterization and tainting of the evaluation resulted in a request for information unrelated to the particular health condition, I disagree. Crenshaw was requesting IOD for stress, anxiety, and depression. Therefore, information about his history of mental health, including substance abuse, is relevant.

[17] For the same reasons stated above, Chief Moran is entitled to summary judgment as to Crenshaw's claim for intentional interference with prospective advantageous relations.

13

Again, Crenshaw points to Chief Moran's misrepresentation of Dr. Reade's evaluation, her biased summary, and the letter she sent to Millville police, motivated by her dislike for his Union activity as the extreme and outrageous conduct. While it is unclear what harm Crenshaw is alleging with regards to this claim, the fact that he points to this conduct suggests that the harm alleged is linked to her behavior after his IOD request and not before. Although Crenshaw was diagnosed with shingles, stress, anxiety, and depression, all of those diagnoses were made prior to the alleged "extreme and outrageous" conduct. To the extent that Crenshaw alleges his harm occurred as a result of the investigation process after his request for IOD, disclosure, and his termination, as explained above, he cannot establish causation.[18]

---

[18] Recognizing that the correlation between Chief Moran's dislike for Crenshaw and his Union activity is concerning, even to the extent Crenshaw could establish causation, the facts of this case simply do not rise to the level necessary for a reasonable person to conclude that Chief Moran's actions were extreme and outrageous. Crenshaw cites *Armano v. Fed. Reserve Bank of Boston*, 468 F. Supp. 674 (D. Mass. 1979), to support his argument. In *Armano*, the court found that based on the allegations that the defendant "undertook a planned and systematic program to harass [plaintiff] in an attempt to force him to voluntarily terminate his employment," a question of fact as to whether his conduct was extreme and outrageous had been raised. *Id*. at 676. The court pointed to the fact that this harassment was evidenced by his demotion, the directing of supervisors "to assign plaintiff to the lowest and most menial tasks," and the spreading of rumors that he was stealing, to support its finding. In contrast to the facts in *Armano*, here, the conduct Crenshaw points to does not constitute harassment but reasonable acts in furtherance of her duties as chief of police, precipitated by Crenshaw's request for IOD leave. *Foley*, 400 Mass. at 99. After Crenshaw requested medical leave, the Town had a right to request an evaluation. *See* Mass. Gen. Laws ch. 41 § 111F; (Doc. No. 53-13 p. 9). Consistent with this request, Dr. Reade "was asked to perform an independent medical examination of Mr. Crenshaw with respect to his current psychiatric functioning, his functioning at the time he left work, and his fitness for duty." (Doc. No. 53-19 p. 2) Once he disclosed the information about his history of substance abuse and made statements inconsistent with his application for a license to carry a firearm, as the chief of police, Chief Moran was obligated to notify the appropriate licensing agency about his potential unlawful license to carry a firearm. Furthermore, as the chief of police, she had a duty to investigate the extent of his disclosed history of substance abuse, his course of treatment, and his response to treatment, in order to ensure Crenshaw's safety, the safety of fellow officers, and the general public. (Doc. No. 76 p. 1) ("A police officer must be physically and psychologically fit to perform his or her public safety functions, especially since police officers are authorized to make arrests and carry firearms. If an officer is not fit, not only that officer, but also other officers as well as the general public may be jeopardized.").

## **Conclusion**

For the reasons discussed, the Defendants motion for summary judgment (Doc. No. 51) is ***granted***.

**SO ORDERED.**

*/s/ Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**
